IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| INDIAN SPRINGS ASSOCIATES, LLC, | * | Chapter 11 |
| Debtor | * | |
| | * | Case No.: 1-05-bk-00791MDF |
| DONALD ERWIN, | * | |
| Movant | * | |
| | * | |
| v. | * | |
| | * | |
| INDIAN SPRINGS ASSOCIATES, LLC, | * | |
| Respondent | * | |

## OPINION

The matter before the Court is the motion filed by Donald Erwin ("Erwin") to dismiss the Chapter 11 petition of Indian Springs Associates, LLC ("Indian Springs" or the "LLC"). Erwin holds a 50% ownership interest in Indian Springs, and the remaining 50% interest is held jointly by Walter and Thelma Diller ("the Dillers"). On February 14, 2005, the Dillers filed the instant petition on behalf of Indian Springs. In his motion, Erwin asserts that the Dillers were not authorized under the terms of the Indian Springs Operating Agreement to file the petition, thus it should be dismissed. A hearing was held regarding Erwin's motion on May 16, 2005, and the parties filed briefs thereafter. The matter is now ripe for decision.[1]

## Factual Findings

On November 21, 2000, Indian Springs was formed as a Pennsylvania limited liability company pursuant to a Certificate of Organization filed with the Pennsylvania Department of

---

[1] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. § 157(b)(2)(A), and (O). This Opinion constitutes the findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052.

1

State. On even date, Erwin and the Dillers executed the Operating Agreement that governs, *inter alia*, the formation, management and ownership of Indian Springs pursuant to the Pennsylvania Limited Liability Company Act, 15 Pa.C.S. §8901 *et seq.* Erwin and the Dillers were named as "members" of the LLC under the Operating Agreement.[2] According to its terms, the company was formed for purposes of acquiring, owning, selling, developing, leasing and operating real property, including mobile home parks. Each member unit made an Initial Capital Contribution of $23,000.00.[3] No specific provision addressing bankruptcy or other decisions outside the ordinary course of business were included in the Operating Agreement. Section 3.10 provided generally that all "questions shall be decided by the vote of a majority of units entitled to vote."

In addition to the initial capital contribution, at the time of the formation of the LLC, the Dillers advanced $130,000.00 to the business and took back a note signed by Erwin as a member of the LLC. Between the formation of the LLC and the filing of the instant petition, the Dillers advanced a total sum of $148,566.64 to the company for its operating expenses. No funds were advanced by Erwin within that same period.

At some point after its formation, Indian Springs obtained secured financing from Pennsylvania State Bank.[4] Repayment of the loan was extended several times, and immediately prior to the filing of the petition, the bank was threatening foreclosure. The Dillers, who were responsible for day to day management of Indian Springs, contacted Erwin in an attempt to

---

[2] Under the state statute, the owners of an LLC are called "Members." 15 Pa.C.S.A. §8903.

[3] The evidence presented by the Dillers at trial credited Erwin with making a capital contribution of $24,858.34 from which $1,929.17 was deducted for a total of $22,929.17.

[4] The terms and amount of this loan are not of record.

obtain his concurrence to the filing of a bankruptcy petition to stop foreclosureby the Bank, but Erwin would not consent. On February 14, 2005, the Dillers convened a "special meeting" of the members to approve a resolution to file a bankruptcy petition. They did not provide notice of the meeting to Erwin as required under Section 3.4 of the Operating Agreement because Erwin previously had stated that he would not agree to the filing. In convening the special meeting and ultimately passing a resolution to file the instant petition, the Dillers were acting on their belief that they were authorized to conduct the meeting without Erwin because their cash advances to the company effectively appointed them as Erwin's attorney-in-fact under the Operating Agreement as provided in Section 9.1(d). They believed that as his attorney-in-fact, they had obtained his proxy to vote in favor of filing the petition.

## Discussion

The issue before the Court is whether Erwin's motion to dismiss should be granted because the Dillers lacked the authority to file a petition on behalf of Indian Springs without Erwin's concurrence. Since an LLC is similar to both a corporation and a partnership, it fits within the description of a "person" who may file bankruptcy under 11 U.S.C. 109(a). *See ICLNDS Notes Acquisition, LLC*, 259 B.R. 289, 292 (Bankr. N.D. Ohio 2001). Although both a corporation and a partnership may be debtors under the Bankruptcy Code, the filing requirements for each entity differ. An individual shareholder may file a voluntary petition on behalf of a corporation as long as he is authorized to do so under state law. *Keenihan v. Heritage Press, Inc.,* 19 F.3d 1255 (8th Cir. 1994) ("A person filing a voluntary bankruptcy petition on a corporation's behalf must be authorized to do so, and the authorization must derive from state law.") (citing *Price v. Gurney*, 324 U.S. 100, 65 S.Ct. 513, 89 L.Ed. 776(1945)).

3

Thus, a voluntary petition may be filed on behalf of a corporation even though not all of its shareholders have consented to the filing. However, a partnership's petition filed without the consent of all partners, although designated as voluntary, is treated as an involuntary petition and must be filed in compliance with the rules governing involuntary petitions. *In re Memphis-Friday's Associates*, 88 B.R. 830, 825 (Bankr. W.D. Tenn. 1988); *In re Cloverleaf Properties*, 78 B.R. 242, 244 (9th Cir. B.A.P. 1987); *In re Seychelles*, 30 B.R. 72, 74 (Bankr. N.D. Tex. 1982).

A limited liability company is as a hybrid of the corporate and partnership business structures. "The two tiered structure of a limited liability company with managers and members was deemed to approximate the structure of a limited partnership, with the managers having the responsibility of general partners to run the business and with the members generally not involved in the conduct of the business and having limited liability analogous to that of limited partners." *Committee Comment - 1994* to 15 Pa. C.S.A. §8409. The members of a limited liability company have limited liability as if they were shareholders of a corporation, but for tax purposes, both the entity and its members are treated as a partnership. *See* Blakemore, "Limited Liability Companies and the Bankruptcy Code: A Technical Review," 13 *Am. Bankr. Inst. J.* 12 (1994). Thus, it is difficult to simply apply principles from bankruptcy cases involving corporate or partnership petitions to a case involving the petition of a limited liability company. Despite the disparate manner in which they are treated, corporate and partnership bankruptcy cases share at least one common thread: "applicable nonbankruptcy law determines whether authority exists for a particular debtor to commence a bankruptcy case." *In re Century/ML Cable Venture,* 294 B.R. 9 (Bankr. S.D. N.Y. 2003). A bankruptcy court has no power to adjudicate a voluntary petition for bankruptcy filed by a party that does not have authority under state law to authorize

4

the filing. *See Price v. Gurney*, *supra.* Thus, in the instant case, the Court will look to state law to determine whether the Dillers were authorized to file the petition for Indian Springs.

Pennsylvania's Limited Liability Company Law, 15 Pa. C.S.A. §8901 *et seq.* ("LLC Law"), does not specify whether a bankruptcy petition may be filed on behalf of an LLC. Under the LLC Law, an operating agreement executed by the members of an LLC governs the conduct of an LLC's affairs. 15 Pa C.S.A. §8916(a). "The operating agreement may contain any provision for the regulation of the internal affairs of the company agreed to by the members, whether or not specifically authorized by or in contravention of this chapter . . ." except where the LLC Law "expressly provides that the operating agreement shall not relax or contravene any provision on a specific subject." 15 Pa.C.S.A. §8915. Thus, under the provisions of the LLC Law, the terms of an operating agreement governs the filing of a bankruptcy petition by an LLC. In the instant case, the Operating Agreement does not address how decisions are to be made about issues that arise outside the ordinary course of business.[5] Other provisions in the Operating Agreement that may be construed as governing the procedure to be followed in order to file a bankruptcy petition are in conflict.

Article 3 of the Operating Agreement addresses the rights and responsibilities of the members of Indian Springs. Section 3.10 states that "[e]very Unit holder of record shall have the right to one vote for each such Unit standing in his name on the books of the Company. All questions shall be decided by the vote of a majority of the Units entitled to vote." Since the

---

[5]In at least two reported cases, the operating agreements of each of the LLCs in question included a provision that "Major Decisions" required the approval of a specified percentage of members, both requiring in excess of 50%. *See In re Avalon Hotel Partners, LLC*, 302 B.R. 377, 380 (Bankr. D. Or. 2003); *In re DeLuca*, 194 B.R. 79, (Bankr. E.D. Va. 1996)

5

Case 1:05-bk-00791-MDF    Doc 61    Filed 09/12/05    Entered 09/13/05 08:38:29    Desc
Main Document    Page 5 of 10

Dillers held 50% of the units on record and Erwin held the other 50%, the "questions" referred to in Section 3.10 could not be decided unless both the Dillers and Erwin were in agreement. Therefore, this provision provides no authority for the Dillers to file a bankruptcy petition on behalf of the LLC. In further support of the motion to dismiss, Erwin asserts that he did not have proper notice of the special meeting, as required under Section 3.4, in which the Dillers resolved to file the instant bankruptcy.[6]

In their response, the Dillers assert that they were empowered to vote Erwin's units because they acquired his proxy, as provided in Section 3.11, when he failed to make required capital contributions under Article 9, Section 9.1(d).[7] The Dillers testified that they made

---

[6]Section 3.4 of the Operating Agreement provides as follows:

Section 3.4     Notice of Meetings.
Written notice of every meeting of the Members shall be given by, or at the direction of, the person authorized to call the meeting to each Member of record entitled to vote at the meeting at least five days prior to the day named for the meeting. . . . Such notice shall specify the place, day and hour of the meeting, and, in the case of a special meeting, the purpose of the meeting and the general nature of the business to be transacted.

[7]Section 9.1 of the Operating Agreement provides in relevant part:

(b) The Members shall contribute such other amounts as an Additional Capital Contribution to reimburse the Company for any costs incurred by the Company related to operating expenses. Such Additional Capital Contributions shall be immediately due and payable upon demand of the Company. A demand of the Company for Additional Capital Contributions shall require a vote of the Managers as provided in Section 4.12 of this Agreement and shall only be made where more than 75% of the Members so agree in writing.

(c) In the event [that] any Member fails to make any additional capital contribution required by the Section ("Non-Contributing Member"), any of the other Members (the "Contributing Member") shall have the right individually, (sic) or collectively to advance directly to the Company the funds required from the Non-Contributing Member as a loan to such Member ("Contribution Loan").

6

contributions to provide working capital to Indian Springs when revenues fell short of expenses. Erwin does not dispute that the Dillers provided cash advances to Indian Springs. He asserts, however, that the advances were loans, not equity contributions. But the Dillers argue that their contributions to the company constituted "Additional Capital Contributions" under the Operating Agreement, which triggered a change in the voting procedures.

An "Additional Capital Contribution" is defined as additional funds agreed to by the Members under the provisions of Section 9.1(b). For the funds contributed by the Dillers to fit this definition, all Members would have had to agreed to the contribution in accordance with Section 9.1(b). That Section, in turn, states that "the Members shall contribute such other amounts as an Additional Capital Contributions *to reimburse the Company* for any costs incurred . . . related to operating expenses. Such Additional Capital Contributions shall be immediately due and payable upon demand of the Company. A demand of the Company . . . shall require a vote of the Managers as provided in Section 4.12 . . . and shall only be made where more than 75% of the Members so agree in writing." (Italics added.) The process of making a demand for an Additional Capital Contribution was twofold – the Managers had to vote for a demand to be

---

(d) . . . The Non-Contributing Member hereby Grants a security interest in such Member Interest to the Contributing Member who has advanced such Contribution Loan and hereby irrevocably appoints the Contributing Member, (sic) as its attorney-in-fact with full power to prepare and execute any documents, instruments, and agreements, including but not limited to any note evidencing the Contribution Loan, and such Uniform Commercial Code financing statements, continuation statements, and such other security documents in favor of the Contributing Member, (sic) as the Contributing Member deems necessary to protect his repayment rights.

made and 75% of the Members had to agree in writing to the making of a demand.[8]

There are two cash contributions made by the Dillers that are at issue. The first was in the amount of $130,000.00 and was made on the same day the LLC was formed. The record is unclear regarding the date or dates of the other contributions, but it is clear that the total amount advanced by the Dillers was $148,566.64. The Court will apply the above-quoted language of the Operating Agreement to each of these contributions.

It is undisputed that Walter Diller was a manager under the Operating Agreement. There is no evidence as to whether or not the $130,000.00 advance made by the Dillers was made pursuant to a meeting of the *managers* as Section 9.1 requires. Assuming that the decision was made at a managers' meeting, then under Section 4.12 Walter Diller's presence when a vote was taken authorizing the LLC to demand Additional Capital Contributions was sufficient to authorize a demand because under Section 4.12 a single manager constituted a quorum for voting purposes. However, there was no evidence introduced to prove that the members had agreed *in writing* to the demand as required by the Operating Agreement. Without such evidence, the Dillers cannot meet the burden of showing that they complied with the provisions of Section 9.1 on which they rely. Even assuming the existence of such a writing, the Dillers would also have to show that more than 75% of the Members had agreed to the making of a demand. There is no evidence that Erwin ever agreed at any time to the making of a demand for Additional Capital Contributions by Indian Springs. Therefore, again, the Dillers are without the

---

[8]Section 4.12 states that "one Manager in office, (sic) shall be necessary to constitute a quorum for the transaction of business, and the acts of one of the Managers present at a meeting at which a quorum is present shall be the acts of the Managers."

evidence required for the Court to conclude that any of the Dillers' additional advances to the company were "Additional Capital Contributions" under the Operating Agreement.

It is for similar reasons that the $148,566.64 capital infusion cannot be considered to have been "Additional Capital Contributions" under the Operating Agreement. The Dillers alone could not unilaterally have authorized the LLC to make a demand for this amount as a capital contribution because only 75% of the members could authorize a demand for capital contributions. Section 9.1(d) does not come in to play because there had never been a properly authorized demand under Section 9.1(b).

Finally, the Court is not convinced that Section 9.1(d) of the Operating Agreement could have provided authority for the Dillers to file the within bankruptcy petition in any event. The appointment of the contributing member as the non-contributing member's attorney-in-fact only authorized the preparation and execution of documents for the purpose of protecting the contributing members repayment rights when they elected to make a contribution loan because another member had failed to honor an authorized capital contribution request. *See* Section 9.1(c) of the Operating Agreement. The power of attorney was for the purpose of providing security for the payment of the contribution loan and not for any other purpose. The Court does not read Section 9.1(d) as empowering a member to vote another member's proxy on issues related to dissolution, which are addressed in Article 12 of the Operating Agreement, bankruptcy, or other issues of corporate existence in the absence of a specific provision in the proxy granting such power.

By filing the bankruptcy petition, the Dillers attempted to convert Indian Springs from an LLC to a debtor in possession, which, under the circumstances of this case, may have led to its

9

dissolution. In the absence of any specific provision in the Operating Agreement describing the vote required to authorize the filing of a bankruptcy petition, the Court finds that the provision in Section 3.10, which requires a majority of the units entitled to vote, to be a more relevant provision. In the instant case, since the Dillers' argument that they could act as Erwin's attorney in fact and vote in favor of the bankruptcy filing is not supported by the Operating Agreement, the Dillers have no other basis by which to assert that they were properly authorized to file the instant petition. Either all units had to agree to file bankruptcy or the members had to unanimously agree to dissolve the corporation. In the absence of a vote of either type authorizing the filing, I find that the petition was filed without proper authorization and must be dismissed.

BY THE COURT,

*Mary D. France*
Bankruptcy Judge

Date: September 12, 2005

*This electronic opinion is signed and filed on the same date.*